### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

THOMAS GLOVER,

      Petitioner,                     Civil No. 2:14-CV-12630
                                         HONORABLE NANCY G. EDMUNDS
v.                                  UNITED STATES DISTRICT JUDGE

JEFFREY WOODS,

      Respondent.
_____/

## OPINION AND ORDER DENYING THE PETITION FOR A WRIT OF HABEAS CORPUS AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY OR LEAVE TO APPEAL IN FORMA PAUPERIS

Thomas Glover, ("Petitioner"), presently confined at the Chippewa Correctional Facility in Kincheloe, Michigan, filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, in which he challenges his conviction for second-degree murder, M.C.L.A. § 750.317; assault with intent to commit murder, M.C.L.A. § 750.83; felon in possession of a firearm, M.C.L.A. § 750.224f; and possession of a firearm during the commission of a felony (felony-firearm), M.C.L.A. § 750.227b. For the reasons that follow, the petition for a writ of habeas corpus is **DENIED**.

### I. Background

Petitioner was convicted following a jury trial in the Wayne County Circuit Court. This Court recites verbatim the relevant facts relied upon by the Michigan Court of Appeals, which are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1). *See Wagner v. Smith,* 581 F.3d 410, 413 (6th Cir. 2009):

This case arises out of the death of Adrian Brown and the shooting of Willie

1

Shears on June 26, 2010, in Detroit, Michigan. At approximately 12:30 a.m. or 12:45 a.m., Brown; brothers, Willie and Robert Shears; and Bernard Crump arrived at a strip club called Starvin' Marvin's. The four men had driven to Starvin' Marvin's in two vehicles: Robert Shears and Crump were in a black Jaguar that Crump was driving, and Willie Shears and Brown were in Brown's van. They parked the vehicles in valet parking. Robert Shears, Willie Shears, and Crump then entered the club, while Brown initially remained outside. Brown came into the club five minutes later. The men then ordered and drank a bottle of vodka. According to the testimony, the men were in the club somewhere between 20 minutes to about an hour. Brown then decided that he wanted to leave. The testimony of Willie Shears, Robert Shears, and Crump varies about what happened next.

According to Robert Shears, he and Brown walked out of the club first, exiting through the front door. Willie Shears and Crump came out just behind them. They stood and waited approximately 10 or 15 minutes for the valet to bring back Brown's van. But then someone from the valet service told them that Brown's van was not in the valet parking area. Brown then took his keys from the valet.

Robert Sears testified that he then heard five or six gunshots. After hearing the shots, Robert Shears then saw Brown fall to the ground. Robert Shears stated that at this time Willie Shears was standing near the front entrance of the club.

According to Robert Shears, after the shooting, although he did not believe that Brown was alive at that point, he called out to Crump to help him put Brown into the Jaguar. As Robert Shears was trying to get Brown into the Jaguar, another unidentified individual approached to help, so Robert Shears ran to look for Brown's van. Robert Shears found the van parked in a field on the next block. He drove to near the front entrance of the club and parked on the street. Robert Shears then found out that Willie Shears had also been shot, so he left to meet Willie Shears at the hospital. At the hospital, Robert Shears learned that Brown, who was at a different hospital, was in fact dead.

According to Willie Shears, after exiting the club, they waited for Brown's van for approximately six or seven minutes. Willie Shears then heard nine or 10 gunshots. But he did not see where the shots were coming from at that time. After the gunshots stopped, Willie Shears saw Brown fall. According to Willie Shears, Brown then asked Willie and Robert Shears to put him in the Jaguar. They rushed over to him, but Willie Shears then heard six or seven more shots, and he was shot in the right ankle. Willie Shears testified that although he did not see him firing the gun, at that point, he saw Glover standing behind the Jaguar, holding a gun. Willie Shears did not see anyone else shooting. After getting shot, Willie Shears left Brown and "hopped" back into

2

the club. He then lay inside the front entrance.

Willie Shears initially testified that he did not see where Glover went after he was shot. However, on cross-examination, he testified that he saw Glover run to the back of the parking lot and then he heard a third series of shots. In total, over the three series of shots, Willie Shears heard approximately 20 shots.

Willie Shears testified that he lay inside the club for approximately five or six minutes before the police arrived. An ambulance took Willie Shears to Henry Ford Hospital. At the hospital, Willie Shears identified a photograph of Glover as the person who shot him.

Crump testified that when they decided to leave the club, the three men left before him because he had ordered food and he had to wait for it. Approximately five minutes later, Crump walked to the door with his food, and someone at the door told him not to go outside because there was shooting in the parking lot. Crump did not hear any shooting, so he went out the door anyway. But after Crump got outside, he heard shooting. Crump did not see where the shooting was coming from because he ducked when he heard the shots. As he was ducking, however, Crump saw Willie Shears run past him, limping on one leg as if he had been shot. According to Crump, the shooting sounded close at first and then sounded like it moved further away. When the shooting was further away, Crump looked up and saw Robert Shears holding Brown and saying that Brown had been shot.

Crump testified that Robert Shears then told him to go find the van. According to Crump, he ran around the parking lot trying to find the valet to get the key, but the van was not in the lot. So then Crump got the Jaguar, and he and Robert Shears tried to put Brown in it, but they were not strong enough, so a security guard helped them. Crump testified that Robert Shears then told him that he was going to take Willie Shears to the hospital and told Crump to take Brown. Crump drove off and took Brown to Receiving Hospital, which was the only hospital with which Crump was familiar. Crump testified that while on the way to the hospital, Brown was "breathing hard." But at the hospital, Crump learned that Brown was dead.

When asked what Brown did for a living, Robert and Willie Shears and Crump all testified that Brown sold drugs. However, they all denied that they themselves sold drugs. All three men also testified that none of them had a gun that night, and they did not see anyone in their group with a gun, including Brown.

Roderick Williams, a reserve police officer for the Highland Park Police Department testified that, at the time of trial, he worked for Starvin' Marvin's

3

Corporation. Reserve Officer Williams was at Starvin' Marvin's on June 26, 2010, at about 1:10 a.m., to see Charles Finn, a manager at Starvin' Marvin's. Reserve Officer Williams entered the club through the front door. He and Finn then went through the back door into an alley behind the club to discuss business because it was loud inside the club. Finn testified that he was asking Reserve Officer Williams to lead the security team at Starvin' Marvin's. Both men testified that the alley was not well lit.

After approximately four to 10 minutes, Reserve Officer Williams heard shots coming from the parking lot. Reserve Officer Williams testified that he heard three or four shots at first, and then he heard another three to five shots. Reserve Officer Williams then saw a man with a gun in his hand running down the alley toward him and Finn. Reserve Officer Williams, who was in full police uniform, "yell[ed] out police." According to Reserve Officer Williams, the man paused and then Reserve Officer Williams saw a muzzle flash, so he drew his firearm, yelled, "Drop your gun," and returned fire with his .357 caliber Sig Sauer semi-automatic pistol. Reserve Officer Williams fired approximately three to five shots, from low to high. He believed that he hit the person he was shooting at because the man spun around, which happens "sometimes when you get shot[.]" The man was then was out of sight. Reserve Officer Williams testified that he did not shoot at the man again after he saw him spin around. Instead, Reserve Officer Williams and Finn retreated back into the club.

Reserve Officer Williams later identified Glover as the person he had seen running toward him. According to Reserve Officer Williams, at the time of the incident, Glover had been wearing a white T-shirt and jeans. Reserve Officer Williams had two guns on him that day; in addition to his .357, he also had a .40 caliber HKP 2000 SK semi-automatic pistol, both of which he turned over to the police.

Starvin' Marvin's manager, Charles Finn, testified that he also works security at Starvin' Marvin's. He testified that the likelihood of someone entering the club with a gun was slim because security personnel performed pat-down searches on everyone entering the club, except police officers with badges.
*************************************************************************************
Michigan State Police Sergeant Reinhard Pope was qualified at trial as an expert in firearms and tool mark identification. In this case, Sergeant Pope initially received two firearms, 13 casings, and three fired bullets. Several days later, he received an additional firearm. The third firearm was a .357 caliber Sig Sauer semi-automatic pistol. The parties stipulated that this gun was taken from the yard or alley near Starvin' Marvin's and was associated with Glover. Sergeant Pope testified that six of the casings came from one firearm, which the parties stipulated was Reserve Officer Williams' weapon. Sergeant Pope testified that the other seven casings came from the Sig

4

Sauer associated with Glover. He also identified one of the fired bullets as having been fired from Reserve Officer Williams' weapon. (The evidence tag number for this bullet—E38015904—was the same evidence tag number for the bullet recovered from Glover—E38015904.) Sergeant Pope identified one of the other bullets, which was the one removed from Brown's body, as having been fired from the firearm associated with Glover. Sergeant Pope eliminated the remaining bullet, which was damaged, from having been fired from Reserve Officer Williams' firearm, but he could not identify or eliminate it as having been fired from the firearm associated with Glover.

*People v. Glover*, No. 302412, 2012 WL 1415122, at *1–3, 5 (Mich. Ct. App. Apr. 24, 2012).

Petitioner's conviction was affirmed on appeal. *Id., lv. den.* 493 Mich. 857, 820 N.W.2d 805 (2012).

Petitioner filed a post-conviction motion for relief from judgment, which was denied by the trial judge. *People v. Glover,* No. 10–008104–FC (Wayne County Cir. Ct., Feb. 14, 2014). The Michigan appellate courts denied petitioner leave to appeal. *People v. Glover,* No. 321705 (Mich.Ct.App. June 18, 2014); *lv. den.* 858 Mich. 46 (2015).

Petitioner seeks a writ of habeas corpus on the following grounds:

I. Verdicts of guilty upon insufficient evidence constituted a denial of due process.

II. Sentences imposed violated constitutional guarantees against cruel and/or unusual punishment.

III. The prosecutor's perfidious and odious mischaracterization of critical evidence and statement undermined the defendant's theory of self-defense, depriving defendant of a defense and a fair trial.

IV. Defendant was denied his federal constitutional right to have the effective assistance defense counsel pursuant to US Const AMS VI, XIV and Const 1963, Art 1, §§ 17, 20 where defense counsel failed to or did not investigate and or admit witnesses and other evidence that would have supported the defendant's claim of self-defense.

V. [duplicate of Issue III].

VI. [duplicate of Issue IV].

5

## II.  Standard of Review

28 U.S.C. § 2254(d), as amended by The Antiterrorism and Effective Death Penalty

Act of 1996 (AEDPA), imposes the following standard of review for habeas cases:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409.  A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11.  "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011)(citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  In order to obtain habeas relief in federal court, a state prisoner is required to show that the state court's

6

rejection of his or her claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington,* 562 U.S. at 103. A habeas petitioner should be denied relief as long as it is within the "realm of possibility" that fairminded jurists could find the state court decision to be reasonable. *See Woods v. Etherton,* 136 S. Ct. 1149, 1152 (2016).

**A. Claim # 1. Petitioner's sufficiency of evidence claim is non-cognizable in habeas review. Alternatively, the evidence was sufficient to rebut petitioner's self-defense claim.**

In his first claim, petitioner argues that there was insufficient evidence presented by the prosecutor to rebut his self-defense claim.

Petitioner's claim is non-cognizable on habeas review. Under Michigan law, self-defense is an affirmative defense. *See People v. Dupree,* 486 Mich. 693, 704, 712; 788 N.W.2d 399 (2010). "An affirmative defense, like self-defense, 'admits the crime but seeks to excuse or justify its commission. It does not negate specific elements of the crime.'" *People v. Reese*, 491 Mich. 127, 155, n. 76; 815 N.W.2d 85 (2012)(quoting *Dupree,* 486 Mich. at 704, n. 11). Although under Michigan law the prosecutor is required to disprove a claim of self-defense, *see People v. Watts*, 61 Mich. App. 309, 311, 232 N.W.2d 396, 398 (1975), "[p]roof of the nonexistence of all affirmative defenses has never been constitutionally required...." *See Smith v. United States,* 133 S. Ct. 714, 719 (2013)(quoting *Patterson v. New York*, 432 U.S. 197, 210 (1977)). The Supreme Court and the Court of Appeals for the Sixth Circuit have rejected the argument that the Constitution requires the prosecution to disprove self-defense beyond a reasonable doubt. *See Gilmore v. Taylor*, 508 U.S. 333, 359 (1993)(Blackmun, J., dissenting)("In those States in which self-defense is an affirmative defense to murder, the Constitution does not require that the prosecution

7

disprove self-defense beyond a reasonable doubt"); *Martin v. Ohio*, 480 U.S. 228, 233-36 (1987); *see also Allen v. Redman*, 858 F.2d 1194, 1197 (6th Cir.1988)(explaining that habeas review of sufficiency-of-the-evidence claims is limited to elements of the crimes as defined by state law and citing *Engle v. Isaac*, 456 U.S. 107 (1982), and *Duffy v. Foltz*, 804 F.2d 50 (6th Cir. 1986)).  Therefore, "the due process 'sufficient evidence' guarantee does not implicate affirmative defenses, because proof supportive of an affirmative defense cannot detract from proof beyond a reasonable doubt that the accused had committed the requisite elements of the crime." *Caldwell v. Russell,* 181 F.3d 731, 740 (6th Cir. 1999).  Petitioner does not challenge the sufficiency of the evidence in support of the essential state law elements of second-degree murder, assault with intent to commit murder, felon in possession of a firearm and felony-firearm, rather, "he has only faulted the jury's refusal to credit his proffered affirmative excuse or justification" for the killing. *Id.* As such, petitioner's claim that the prosecutor failed to disprove his affirmative defense is non-cognizable on habeas review. *Id.; Allen v. Redman,* 858 F.2d at 1200.

Even if this Court were to determine that petitioner's claim was cognizable, he would not be entitled to habeas relief.  It is beyond question that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship,* 397 U.S. 358, 364 (1970).  But the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is, "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979).  This inquiry, does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt."  Instead, the relevant

8

question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* at 318-19 (internal citation and footnote omitted)(emphasis in the original).

More importantly, a federal habeas court may not overturn a state court decision that rejects a sufficiency of the evidence claim simply because the federal court disagrees with the state court's resolution of that claim and may only grant habeas relief if the state court decision was an objectively unreasonable application of the *Jackson* standard. *See Cavazos v. Smith,* 132 S. Ct. 2, 4 (2011). "Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." *Id.* For a federal habeas court reviewing a state court conviction, "the only question under *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*, 132 S. Ct. 2060, 2065 (2012).

On habeas review, a federal court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor was observed at trial. *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983). This Court did not preside over the trial and, therefore, cannot evaluate in any way the critical credibility factors that only the jury was in a position to do. It is the province of the factfinder to weigh the probative value of the evidence and resolve any conflicts in testimony. *Neal v. Morris*, 972 F.2d 675, 679 (6th Cir. 1992). A habeas court must defer to the fact finder for its assessment of the credibility of witnesses. *See Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir.2003).

Under Michigan law, one acts lawfully in self-defense if he or she honestly and

9

reasonably believes that he or she is in danger of serious bodily harm or death, as judged by the circumstances as they appeared to the defendant at the time of the act. *Blanton v. Elo*, 186 F.3d 712, 713, n. 1 (6th Cir. 1999)(citing *People v. Heflin*, 434 Mich. 482; 456 N.W.2d 10 (1990)).   To be lawful self-defense, the evidence must show that: (1) the defendant honestly and reasonably believed that he or she was in danger; (2) the danger feared was death or serious bodily harm or imminent forcible sexual penetration; (3) the action taken appeared at the time to be immediately necessary; and (4) the defendant was not the initial aggressor. *See Johnigan v. Elo,* 207 F. Supp. 2d 599, 608-09 (E.D. Mich. 2002)(citing *People v. Barker*, 437 Mich. 161, 165; 468 N.W.2d 492 (1991); *People v. Kemp*, 202 Mich. App. 318, 322; 508 N.W.2d 184 (1993); *People v. Deason*, 148 Mich. App. 27, 31; 384 N.W.2d 72 (1985)).   Under Michigan law, a defendant is not entitled to use any more force than is necessary to defend himself. *Johnigan,* 207 F. Supp. 2d at 609 (citing *Kemp*, 202 Mich. App. at 322).   "[T]he law of self-defense is based on necessity, and a killing or use of potentially lethal force will be condoned only when the killing or use of potentially lethal force was the only escape from death, serious bodily harm, or imminent forcible sexual penetration under the circumstances." *Johnigan,* 207 F. Supp. 2d at 609 (internal citation omitted).

The prosecution presented evidence from which a rational trier of fact could have concluded beyond a reasonable doubt that the prosecutor had rebutted petitioner's self-defense claim.

The Michigan Court of Appeals rejected petitioner's self-defense claim as follows:

There was sufficient evidence that Glover did not honestly and reasonably believe that his life was in imminent danger or that there was a threat of serious bodily harm. Although Glover testified that he saw Brown and one

10

or two other people shooting at him, Robert Shears, Willie Shears, and Crump all testified that none of them, including Brown, carried a gun. And contrary to Glover's suggestion, the facts that Brown sold drugs, had multiple cellular telephones, and had a significant amount of cash do not necessarily mean that he also had a gun. Similarly, the mere fact that Crump and Robert Shears left the scene does not in and of itself imply that they were armed and were seeking to dispose of their weapons.

Moreover, Willie Shears testified that he heard two series of shots and a third series when Glover ran to the back of the parking lot. Reserve Officer Williams similarly heard two series of shots before he saw Glover run toward the alley with a gun and more shooting occurred. Sergeant Reinhard Pope examined three guns, Reserve Officer Williams' two guns and the gun associated with Glover. All of the found casings were identified as having come from either Reserve Officer Williams' gun or the gun associated with Glover. One bullet was excluded as being fired from Reserve Officer Williams' gun, but could not be excluded or identified as having been fired from Glover's gun. Glover suggests that the testimony of many of the prosecution's witnesses was not credible. However, "[t]he credibility of witnesses and the weight accorded to evidence are questions for the jury, and any conflict in the evidence must be resolved in the prosecutor's favor."[1]

Glover also claims that he was shot from behind and the prosecution failed to prove otherwise. However, although Glover did testify that he was shot from behind, he admitted on cross-examination that his medical records did not confirm this assertion and that it was his own conclusion or opinion. Reserve Officer Williams' testimony suggested that he shot Glover from the front and a bullet from Reserve Officer Williams' gun was removed from Glover. Thus, a rational trier of fact could have found that Glover was not shot from behind as he was running away, but rather that Reserve Officer Williams shot him from the front.

*People v. Glover*, 2012 WL 1415122, at *7-8.

Furthermore, Brian Schloff, a forensic scientist at the Michigan State Police forensic crime lab testified that based on the DNA profiles obtained from the evidence, the bloodstains from the Sig Sauer and the alley matched Glover's DNA. *People v. Glover*, 2012 WL 1415122, at * 4.

---

[1] *People v. Harrison*, 283 Mich.App. 374, 378; 768 N.W.2d 98 (2009).

The parties also stipulated that the gun was taken from the yard or alley near Starvin' Marvin's and was associated with Glover.  In regards to casings retrieved, Sergeant Pope testified that six of the casings came from one firearm, which the parties stipulated was Reserve Officer Williams' weapon, and the other seven casings came from the Sig Sauer associated with Glover.  Sergeant Pope also identified that one of the fired bullets that was fired from Reserve Officer Williams' weapon, evidence tag number E38015904, was the same evidence tag number for the bullet recovered from Glover—E38015904.  Sergeant Pope further testified that one of the other bullets, which was the one removed from Brown's body, had been fired from the firearm associated with Glover. *People v. Glover*, 2012 WL 1415122, at * 5.

There was sufficient evidence for a rational trier of fact to conclude that the prosecutor had proven beyond a reasonable doubt that petitioner did not act in lawful self-defense when he shot the victim.  Other than petitioner's trial testimony, the record is void of any evidence to support petitioner's contention that Brown, Robert Shears, Willie Shears or Bernard Crump were armed with a gun and that he fired in self-defense.

Furthermore, the Michigan Court of Appeals found that when a man fires a shot at a man with the intent to kill him and shoots a bystander instead in the leg, the intent to kill is transferred. *Id.* at *8.  The there was also sufficient evidence to support a finding of assault with intent to commit murder when petitioner shot Willie Shears in the ankle.  Petitioner's sufficiency of the evidence claims are without merit.

### B.  Claim # 2.  The sentencing claim.

Petitioner alleges that his sentence violates the constitutional prohibition against cruel and unusual punishment.

To the extent that petitioner argues that his sentence is disproportionate under state law, he fails to state a claim for federal habeas relief. *See Austin v. Jackson*, 213 F.3d 298, 300 (6th Cir. 2000).  There is also no federal constitutional right to individualized sentencing. *See United States v. Thomas*, 49 F.3d 253, 261 (6th Cir. 1995).

A habeas petitioner who seeks to challenge the severity of a prison sentence on Eight Amendment grounds faces a formidable challenge.  He or she may obtain relief only by demonstrating that a state court decision contravened or misapplied "clearly established" Supreme Court precedent.  However, the Supreme Court has acknowledged "that our precedents in this area have not been a model of clarity."*Lockyer v. Andrade,* 538 U.S. 63, 72.  "Indeed, in determining whether a particular sentence for a term of years can violate the Eighth Amendment, we have not established a clear or consistent path for courts to follow." *Id.*  Thus, the Supreme Court declared that the general applicability of the proportionality standard to term-of-years sentences was clearly established, but confessed a lack of clarity as to the factors lower courts should consider in making that determination. *Id.*  The Supreme Court concluded that "the only relevant clearly established law amenable to the 'contrary to' or 'unreasonable application of' framework is the gross disproportionality principle, the precise contours of which are unclear, applicable only in the 'exceedingly rare' and 'extreme' case." *Id.*

In *Lockyer,* the Supreme Court reversed the Ninth Circuit's grant of a writ of habeas corpus on the ground that two twenty-five-year-to-life sentences imposed under California's "three strikes" law, where the triggering felony was the theft of $ 150 worth of video tapes, violated the Cruel and Unusual Punishment Clause of the Eighth Amendment. The Supreme Court noted that the "thicket" created by its jurisprudence consisted primarily

13

of its decisions in *Solem v. Helm,* 463 US. 277 (1983), *Harmelin v. Michigan*, 501 U.S. 957 (1991), and *Rummel v. Estelle*, 445 U.S. 263 (1980). The California state court observed that the proportionality rule set forth in *Solem* was cast into doubt by *Harmelin,* and proceeded to analyze Andrade's sentence under the approach taken in *Rummel,* where the Supreme Court rejected a claim that a life sentence imposed under Texas' recidivist statute was grossly disproportionate to the theft felonies that formed the predicate for the sentence. The California court concluded that Andrade's sentence was not disproportionate. The Supreme Court held that this decision was not contrary to or an objectively unreasonable application of federal law that was clearly established by the Supreme Court. *Lockyer,* 538 U.S. at 72-77.

A plurality of the Supreme Court has held that the Eighth Amendment does not require strict proportionality between the crime and sentence. *Harmelin,* 501 U.S. at 965. As the Supreme Court observed in *Lockyer,* it is generally recognized after *Harmelin* that the Cruel and Unusual Punishment Clause of the Eighth Amendment forbids only an extreme disparity between crime and sentence, that is, sentences that are "grossly disproportionate" to the crime. *Id.* at 1001 (Kennedy, J., concurring); *Coleman v. Mitchell,* 268 F.3d 417, 453 (6th Cir. 2001)(citing *Coker v. Georgia,* 433 U.S. 584, 592 (1977)); *United States v. Hopper,* 941 F.2d 419, 422 (6th Cir. 1991)).

"Outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare." *Rummel,* 445 U.S. at 272. Rummel was convicted of obtaining $ 120.75 by false pretenses, a crime punishable by at least two years, but not more than ten years in prison. He was sentenced as a

14

recidivist to life imprisonment with the possibility of parole. His two prior felonies consisted of fraudulent use of a credit card to obtain $ 80 worth of goods and services, a felony punishable by two to ten years in prison; and passing a forged check for $ 28.36, a crime punishable by two to five years in prison. The Supreme Court held that Rummel's life sentence under the state recidivist statute did not constitute cruel and unusual punishment. In *Harmelin,* the Supreme Court upheld a life sentence without the possibility of parole for possession of more than 650 grams of cocaine for an offender with no prior felony convictions.

The Supreme Court overturned a life sentence in *Solem* on the ground that it was significantly disproportionate to Helm's crime and therefore prohibited by the Eighth Amendment. However, Helm had been sentenced to life imprisonment *without* the possibility of parole for uttering a "no account" check for $ 100, and his prior felonies also were minor, nonviolent crimes. By contrast, the Supreme Court reaffirmed *Rummel* and found constitutionally sufficient a sentence of twenty-five years to life imposed upon a fifth felony conviction. *Ewing v. California,* 538 U.S. 11, 24-31 (2003).

In the present case, petitioner's sentence fell within the maximum sentence set by state law, and "a sentence within the statutory maximum set by statute generally does not constitute 'cruel and unusual punishment.'" *United States v. Organek,* 65 F.3d 60, 62 (6th Cir. 1995)(citation omitted)(quoted with approval in *Austin v. Jackson*, 213 F.3d at 302). "As long as the sentence remains within the statutory limits, trial courts have historically been given wide discretion in determining 'the type and extent of punishment for convicted defendants.'" *Austin,* 213 F.3d at 301 (quoting *Williams v. New York,* 337 U.S. 241, 245

(1949)).

In light of "the vagueness of the gross-disproportionality principle and the admonition that the principle is "applicable only in the 'exceedingly rare' and 'extreme' case," this Court concludes that the state courts did not unreasonably apply clearly established law in rejecting petitioner's proportionality claim. See *Smith v. Howerton*, 509 F.Appx. 476, 484 (6th Cir. 2012)(internal quotations omitted).  Petitioner is not entitled to relief on his second claim.

**C.  Claims ## 3 and 5.  The prosecutorial misconduct claim**.

The Court will consolidate Claim # 3 and Claim # 5 because they are identical.

Petitioner contends that he was denied his right to a defense and a fair trial when the prosecutor mischaracterized critical evidence and made statements that under minded his theory of self-defense.

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004)(citing *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003)).  A prosecutor's improper comments will be held to violate a criminal defendant's constitutional rights only if they "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)(quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). Prosecutorial misconduct will thus form the basis for habeas relief only if the conduct was so egregious as to render the entire trial fundamentally unfair based on the totality of the circumstances. *Donnelly v. DeChristoforo*, 416 U.S. at 643-45.  In order to obtain habeas

16

relief on a prosecutorial misconduct claim, a habeas petitioner must show that the state court's rejection of his or her prosecutorial misconduct claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012)(quoting *Harrington*, 562 U.S. at 103).

Petitioner claims that the prosecutor mischaracterized evidence contained within his medical records.  The medical records were not entered into evidence.  Therefore, the prosecutor did not mischaracterize evidence.

Petitioner also claims that the information that the prosecutor mischaracterized pertained to the location of the wounds, suggesting that the wounds to his front were the cause of the wounds to his back, to supporting a finding that petitioner did not act in self-defense.  However, petitioner agreed that his medical records did not make any indication of entrance and exit locations.

The Michigan Court of Appeals found the prosecutor did not mischaracterize the medical records or petitioner's testimony in connection with the gunshot wounds.  The Michigan Court of Appeals further found that petitioner had the opportunity to answer the prosecutor's questions and correct any errors. *Glover,* 2012 WL 1415122, at *10-11.

For a prosecutor's cross-examination of a witness to rise to the level of prosecutorial misconduct, a defendant is required to show intentional misconduct or reckless disregard for the truth on the part of the prosecutor. *United States v. Sexton,* 119 F.Appx. 735, 750 (6th Cir. 2005)*, vacated in part on other grounds,* No. 2005 WL 6011238 (6th Cir. Apr. 4, 2005).  The questions posed pertaining to the gunshot wounds by the

prosecutor to petitioner were relevant to rebut petitioner's theory of self-defense.   A prosecutor does not commit misconduct by asking witnesses relevant questions. *See Slagle v. Bagley,* 457 F.3d 501, 518 (6th Cir. 2006).  Because the questions concerning the wounds as documented in the medical report were relevant on the issue of self-defense and petitioner's credibility, the questions did not deprive petitioner of a fair trial. *Tan Van Le v. Prelesnik,* No. 2006 WL 2620693, at *10 (W.D. Mich. Sept. 12, 2006) ("The [Supreme ]Court has never found misconduct arising from a prosecutor's cross-examination on a central issue such as witness bias.").

Finally, the jury was instructed that the lawyers' questions were not evidence. (Tr. 12/8/2010, pp. 126-130).  "[J]urors are presumed to follow their instructions." *Kansas v. Marsh*, 548 U.S. 163 (2006); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987).  Any prosecutorial misconduct pertaining to comments made in connection to petitioner's medical records or trial testimony was ameliorated by the trial court's instruction that the lawyers' comments and statements were not evidence. *See Hamblin v. Mitchell,* 354 F.3d 482, 495 (6th Cir. 2003).  Furthermore, the Michigan Court of Appeals concluded that the jury was free to accept or reject petitioner's testimony. *Glover,* 2012 WL 1415122 at *13. Petitioner is not entitled to habeas relief on his prosecutorial misconduct claims.

**D.  Claims ## 4 and 6.  The ineffective assistance of counsel claims.**

The Court will consolidate Claim # 4 and Claim # 6 because they are identical.

Petitioner contends that he was denied the effective assistance of trial counsel when counsel failed to investigate, present evidence and witnesses, introduce Brown's criminal history, and object to prosecutorial misconduct.

18

To show that he or she was denied the effective assistance of counsel under federal constitutional standards, a defendant must satisfy a two prong test. First, the defendant must demonstrate that, considering all of the circumstances, counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In so doing, the defendant must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance. *Id.* In other words, petitioner must overcome the presumption that, under the circumstances, the challenged action might be sound trial strategy. *Strickland,* 466 U.S. at 689. Second, the defendant must show that such performance prejudiced his defense. *Id.* To demonstrate prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. The Supreme Court's holding in *Strickland* places the burden on the defendant who raises a claim of ineffective assistance of counsel, and not the state, to show a reasonable probability that the result of the proceeding would have been different, but for counsel's allegedly deficient performance. *See Wong v. Belmontes*, 558 U.S. 15, 27 (2009).

On habeas review, "the question 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable-a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)(quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). "The pivotal question is whether the state court's application of the *Strickland*

19

standard was unreasonable.  This is different from asking whether defense counsel's performance fell below *Strickland's* standard." *Harrington v. Richter*, 562 U.S. at 101. Indeed, "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles,* 556 U.S. at 123 (citing *Yarborough v. Alvarado*, 541 U.S. at 664).  Pursuant to the § 2254(d)(1) standard, a "doubly deferential judicial review" applies to a *Strickland* claim brought by a habeas petitioner. *Id.*  This means that on habeas review of a state court conviction, "[A] state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself."*Harrington*, 562 U.S. at 101.  "Surmounting *Strickland's* high bar is never an easy task." *Id.* at 105 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)).

Petitioner first argues that his trial counsel was ineffective for failing to investigate. The Michigan Court of Appeals denied this claim, citing to the fact that a private investigator went to the scene which would suggest that trial counsel did investigate. *Glover,* 2012 WL 1415122 at *11.

Petitioner argues in his motion for relief from judgment (referenced in his habeas petition) that trial counsel failed to interview state witnesses Robert Shears and Willie Shears, thereby denying petitioner's right to adequately cross-examine the Shears brothers.  Trial counsel's performance did not constitute ineffective assistance of counsel where the record shows that counsel carefully cross-examined Robert and Willie Shears and in his closing argument emphasized the weaknesses in their testimony. *See Krist v. Foltz,* 804 F.2d 944, 948-49 (6th Cir. 1986)(defense counsel was not ineffective where he

20

carefully cross-examined prosecution witnesses, his cross-examination on issue of presence of weapon developed record upon which state court reversed one of armed robbery convictions, and in closing argument counsel emphasized inconsistencies in testimony of various witnesses).   Defense counsel did not perform ineffectively by not more forcefully cross-examining the witnesses, particularly when the effect of further probing is entirely speculative on petitioner's part. *See Jackson v. Bradshaw,* 681 F.3d 753, 764-65 (6th Cir. 2012)(Defense counsel did not perform ineffectively by not more forcefully pressing witness on the issue of her possible bias she may have harbored against defendant, particularly when the effect of further probing was speculative).

Petitioner also argues in his motion for relief from judgment (referenced by his habeas petition) that trial counsel failed to investigate the evidence technician's report and photos.  A defense counsel has no obligation to present evidence or testimony that would not have exculpated the defendant. *See Millender v. Adams,* 376 F.3d at 527 (internal quotation omitted).  The record reflects that the forensic evidence established that the spent casings only came from two guns, Petitioner's and Officer William's handgun. Presentation of the evidence technician's report and photos would not have exonerated petitioner.

Petitioner argues that trial counsel failed to present evidence and witnesses to support his theory of self-defense.  Petitioner contends that had counsel called his treating doctors and witnesses at the crime scene, the outcome of the trial would have been different.

Although the petitioner briefly mentions counsel's failure to call his treating doctors

21

and witnesses at the crime scene, which he contends should have been called on his behalf, petitioner failed to attach any affidavits from these witnesses to his supplemental brief, nor has he provided this Court with any affidavits from these witnesses concerning their proposed testimony and willingness to testify on the petitioner's behalf. Conclusory allegations of ineffective assistance of counsel, without any evidentiary support, do not provide a basis for habeas relief. *See Workman v. Bell,* 178 F.3d 759, 771 (6th Cir. 1998). By failing to present any evidence to the state courts in support of his ineffective assistance of claim, petitioner is not entitled to an evidentiary hearing on his ineffective assistance of counsel claim with this Court. *See Cooey v. Coyle*, 289 F.3d 882, 893 (6th Cir. 2002)(citing 28 U.S.C. § 2254(e)(2)(A)(ii)). Petitioner has failed to attach any offer of proof or any affidavits sworn by the proposed witnesses. Petitioner has offered, neither to the Michigan courts nor to this Court, any evidence beyond his own assertions as to whether the witnesses would have been able to testify and what the content of these witnesses' testimony would have been. In the absence of such proof, petitioner is unable to establish that he was prejudiced by counsel's failure to call these witnesses to testify at trial, so as to support the second prong of an ineffective assistance of counsel claim. *See Clark v. Waller,* 490 F.3d 551*,* 557 (6th Cir. 2007).

Petitioner argues that trial counsel was ineffective by failing to introduce Brown's criminal record. The Michigan Court of Appeals found that petitioner failed to explain under what theory Brown's record would have been admissible or how it would have affected the outcome of the case, since there was already testimony from Willie Shears that Brown had gone to jail for "weed." *Glover,* 2012 WL 1415122 at *12.

22

A defense counsel has no obligation to present evidence or testimony that would not have exculpated the defendant. *See Millender v. Adams,* 376 F.3d at 527(internal quotation omitted).  Petitioner claims that presentation of Brown's criminal record would have effected the outcome of his the case; however, the record contains trial testimony pertaining to Brown's criminal history.  Because there is no evidence that Brown was armed that night, there is no reasonable probability that presentation of Brown's firearm conviction contained within his criminal record would have effected the outcome of the trial.

Petitioner next contends that counsel was ineffective for failing to object to the prosecutor's remarks pertaining to the gunshot wounds and petitioner's claim of self-defense.

To show prejudice under *Strickland* for failing to object to prosecutorial misconduct, a habeas petitioner must show that but for the alleged error of his trial counsel in failing to object to the prosecutor's improper questions and arguments, there is a reasonable probability that the proceeding would have been different.  *Hinkle v. Randle,* 271 F.3d 239, 245 (6th Cir. 2001).  Because this Court has already determined that the prosecutor's questions did not deprive petitioner of a fundamentally fair trial, petitioner is unable to establish that he was prejudiced by counsel's failure to object to the remarks. *Slagle v. Bagley ,* 457 F.3d at 528.  Petitioner is not entitled to habeas relief on his fourth claim.

### IV.  Conclusion

The Court will deny the petition for a writ of habeas corpus with prejudice.  The Court will also deny a certificate of appealability to petitioner.  In order to obtain a

23

certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2).  To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000).  "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254; *see also Strayhorn v. Booker,* 718 F. Supp. 2d 846, 875 (E.D. Mich. 2010).

For the reasons stated in this opinion, the Court will deny petitioner a certificate of appealability because he has failed to make a substantial showing of the denial of a federal constitutional right. *See Allen v. Stovall,* 156 F. Supp. 2d 791, 798 (E.D. Mich. 2001).  The Court will also deny petitioner leave to appeal *in forma pauperis*, because the appeal would be frivolous. *Id.*

## V. <u>ORDER</u>

Based upon the foregoing, IT IS ORDERED that the petition for a writ of habeas corpus is **DENIED WITH PREJUDICE.**

IT IS FURTHER ORDERED that Petitioner is **Denied** an evidentiary hearing.

IT IS FURTHER ORDERED that a certificate of appealability is **DENIED.**

IT IS FURTHER ORDERED that Petitioner will be **DENIED** leave to appeal *in forma*

*pauperis.*

s/ Nancy G. Edmunds
**HON. NANCY G. EDMUNDS**
UNITED STATES DISTRICT JUDGE

Dated:February 7, 2017

CERTIFICATION

I hereby certify that a copy of this Opinion was issued to parties and/or counsel of record on this 7th day of February, 2017 by regular mail and/or CM/ECF Notification.

s/ Carol J Bethel
Case Manager

Date: 2/7/17

25